In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3243

JASON M. SENNE,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF PALATINE,
ILLINOIS,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-05434—**Matthew F. Kennelly**, *Judge*.

REARGUED EN BANC FEBRUARY 9, 2012—DECIDED AUGUST 6, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER, FLAUM,
RIPPLE, KANNE, ROVNER, WOOD, WILLIAMS, SYKES, TINDER
and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Jason Senne's vehicle was parked
overnight on a public way in the Village of Palatine,
Illinois (the "Village"), where such parking was prohib-
ited by ordinance. Village authorities placed a parking
citation on his windshield. Various pieces of personal

information, obtained by the Village from a database originating with the Illinois Department of Motor Vehicles, were printed on the citation. Mr. Senne subsequently brought this action on behalf of himself and a class of others similarly situated against the Village.[1] He claimed that the Village's practice of printing personal information obtained from motor vehicle records on parking tickets was a violation of the Driver's Privacy Protection Act (the "Act" or the "DPPA"), 18 U.S.C. §§ 2721-25. Under the DPPA, state departments of motor vehicles ("DMVs") are restricted in their ability to disclose certain personal information contained in motor vehicle records; authorized recipients are further restricted in redisclosing information obtained from those records. *See id.* § 2721. Injured persons are provided with a private right of action. *See id.* § 2724.

The Village moved to dismiss Mr. Senne's claim for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). It contended that issuing a parking citation was not a disclosure under the statute and that, even if it were, it fell within a specifically permitted purpose identified in the statute. The district court agreed and granted the Village's motion. A panel of this court affirmed, *Senne v. Vill. of Palatine, Illinois*, 645 F.3d 919 (7th Cir. 2011), and the full court

---

[1] The district court's jurisdiction was premised on 28 U.S.C. § 1331 and 18 U.S.C. § 2724.

granted rehearing en banc.[2] Mr. Senne's appeal requires that we examine the scope of the DPPA's protection of personal information contained in motor vehicle records and the reach of its statutory exceptions. We now conclude that the parking ticket at issue here did constitute a disclosure regulated by the DPPA, and we further agree with Mr. Senne that, at this stage of the litigation, the facts as alleged are sufficient to state a claim that the disclosure on his parking ticket exceeded that permitted by the statute. Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A. Facts

Mr. Senne's complaint, which we must accept for present purposes as true,[3] alleges that, on August 20, 2010, his vehicle was parked on a public way in violation of the Village's overnight parking ban. At 1:35 a.m., a Palatine police officer placed a parking citation under a windshield wiper blade of the vehicle. The citation remained on the windshield, in public view on a public way, until Mr. Senne retrieved it some five hours later.

---

[2]  Our jurisdiction is predicated on 28 U.S.C. § 1291.

[3]  *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012).

The ticket had been printed electronically on a pre-existing form. The printed information included a date and time stamp, the officer's name and badge number and the parking offense, which was the basis for the citation. It also included various information about the vehicle, including the make, model, color, year, license number and vehicle identification number ("VIN"). In addition, and most relevant to the present case, the citation included personal data about Mr. Senne, whom motor vehicle records showed to be the owner of the illegally parked vehicle. Specifically, the citation included his full name, address, driver's license number, date of birth, sex, height and weight.

The citation doubled as an envelope to remit payment of the fine, which, if used as intended, would have displayed the printed personal information on its exterior when mailed. It instructed Mr. Senne that he could either pay the $20 fine in person, mail a check or money order using the ticket as an envelope or request a hearing to contest the citation.

## B.  District Court Proceedings

After receiving the citation, Mr. Senne brought this action in the district court. He alleged that the parking ticket amounted to a disclosure of protected personal information by the Village in violation of the DPPA. His complaint requested, for himself and a putative class, statutory liquidated damages and injunctive relief. He also requested limited, expedited discovery relating to the total number of parking citations issued by the

Village in the relevant period. Shortly thereafter, he moved for a temporary restraining order and preliminary injunction prohibiting the Village from printing any personal information, as defined by the DPPA, on its parking citations.

In response, the Village filed a motion to dismiss for failure to state a claim under Rule 12(b)(6). It contended that the parking ticket was a permitted disclosure under three separate categories in the statute: It was a disclosure (1) "[f]or use by a[] government agency, including a[] . . . law enforcement agency, in carrying out its functions," as permitted by § 2721(b)(1); (2) "[f]or use in connection with matters of motor vehicle or driver safety," as permitted by § 2721(b)(2); and (3) "[f]or use in connection with any civil[] . . . [or] administrative[] . . . proceeding . . ., including the service of process," as permitted by § 2721(b)(4). The Village later clarified that it did not concede that any disclosure had occurred, other than to the plaintiff, who was the subject of the record.

In a brief oral ruling, the district court agreed with the Village and dismissed the case. The court specifically held that the parking ticket did not fall within the ambit of the statute because its issuance did not constitute a disclosure. In the district court's view, "what the statute is talking about is what people would commonly call a disclosure, which is turning something over to somebody else."[4] Although the court found this basis sufficient and concluded that reaching the statutory

---

[4]  R.37 at 4.

exceptions was unnecessary, it also held that § 2721(b)(1), relating to a law enforcement agency carrying out its functions, would exempt any disclosure made through the parking citation. Mr. Senne timely appealed.

## II

## DISCUSSION

We review de novo the district court's entry of judgment on a motion to dismiss for failure to state a claim.[5] We must construe the complaint in the light most favorable to the plaintiff and must draw all reasonable inferences in his favor.[6] Taking the facts of the complaint as true, the Village contends that the DPPA provides no basis for relief.[7]

The Village contends that the district court's judgment ought to be affirmed for two reasons. First, it submits that the printing of Mr. Senne's personal information on the citation and the placement of that citation on his windshield did not constitute a disclosure under the Act. Second, it submits that, in any event, the action specifically was permitted by the exceptions to the general limitation on disclosure in the statute. We shall address each argument in turn.

---

[5]  *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 492 (7th Cir. 2011).

[6]  *Id.* at 492-93.

[7]  The parties raise no issue with respect to the adequacy of the allegations in the complaint under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## A. Whether the Ticket is a Disclosure Regulated by the DPPA

"As in any case of statutory construction, our analysis begins with the language of the statute." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks omitted). Specifically, we begin by looking broadly at the structure of the statute to acquire an understanding of the activity that it regulates. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute[] . . . ." *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006).

Section 2721 contains the substantive prohibitions and relevant exceptions that principally concern us. It begins with a general restriction on the release of information *by a state DMV*:

> **(a) In general.**--A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity:
>
> > **(1)** personal information, as defined in 18 U.S.C. 2725(3),[8] about any individual

---

[8] Section 2725(3) of title 18 defines "personal information" as information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or

(continued...)

obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section; or

**(2)** highly restricted personal information, as defined in 18 U.S.C. 2725(4),[9] about any individual obtained by the department in connection with a motor vehicle record, without the express consent of the person to whom such information applies, except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9): *Provided*, That subsection (a)(2) shall not in any way affect the use of organ donation information on an individual's driver's license or affect the administration of organ donation initiatives in the States.

18 U.S.C. § 2721(a). Subsection (b) defines various exceptions, to which we shall return in some detail. If an exception in subsection (b) permits disclosure by a state DMV to a specific second party, subsection (c) then

---

[8] (...continued)
    disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

[9] "[H]ighly restricted personal information," as defined in 18 U.S.C. § 2725(4), "means an individual's photograph or image, social security number, [and] medical or disability information." The parties are in agreement that this category of information, and the restrictions applicable to it, are not at issue in the present case.

regulates the separate activity that occurs when the *recipient* of a record from the DMV is responsible for a secondary disclosure to a third party. Specifically, subsection (c) allows for authorized recipients to "resell or redisclose the information only for a use permitted under subsection (b)," with further exceptions and requirements that need not detain us.[10] Both subsection (a) and (c), therefore, regulate a particular kind of disclosure and direct the details of that regulation to subsection (b).

Our examination of the statute's structure brings into focus the precise context in which the present case arises. The initial disclosure by the Illinois DMV to the police department, or some other agency through which the police department obtained its record, is governed by subsections (a) and (b); we discern no claim in this case that this transaction violated the statute. Instead, we are concerned with the secondary act of the Village's police department in placing the citation, which included Mr. Senne's personal information, on the windshield. With that clarification, we turn to the first question presented: whether the parking citation constituted a disclosure that the statute regulates.

The statute does not define a disclosure, but it does provide us, in context, with sufficient information to discern the meaning of the term. *Smith v. Zachary*, 255 F.3d 446, 448 (7th Cir. 2001) ("[T]he meaning of statutory

---

[10] Subsections (d) and (e) relate to waivers of the statute's restrictions by the subject of the record, and limitations by which the State may obtain such waivers; neither is claimed to be in issue in the present case.

language, plain or not, depends on context. It is a funda-
mental canon of statutory construction that the words of
a statute must be read in their context and with a view
to their place in the overall statutory scheme." (internal
quotation marks omitted) (citations omitted)). The term
"disclose" is first used in subsection (a), in the statu-
tory prohibition on initial disclosures. In that section, the
statute forbids a state DMV from "knowingly disclos[ing]
or otherwise mak[ing] available to any person or entity"
protected personal information. In our view, attaching
the terms "or otherwise make available" to the term
"disclose" leaves little doubt about the breadth of the
transactions Congress intended to regulate. Furthermore,
we believe it appropriate to read the statute's later use
of the term "disclose" and of "redisclose" as short-
handed references back to subsection (a) and the broad
language employed there. So read, it is clear that Con-
gress intended to include within the statute's reach
the kind of publication of information that occurred
here, namely, the placement of the printed citation on
Mr. Senne's windshield.

The Village nevertheless maintains that placing the
ticket on the windshield did not effect a "disclos[ur]e"
within the meaning of the statute, principally because
Mr. Senne has failed to allege that anyone other than he,
the subject of the record, actually saw it. We are not
persuaded by this argument. First, such an interpreta-
tion ignores the broad language employed by Congress
to define and regulate disclosures. Second, such a
reading turns the statutory structure on its head. The
default rule of the statute is that the DMV, and any
person or entity authorized to view its records, is

*prohibited* from sharing the information. The statute then *authorizes* specific disclosures—each of which, as we shortly shall examine, has a limited object and a limited class of recipients. *See* 18 U.S.C. § 2721(b). To suggest that the meaning of the term "disclose" is so limited as to take the act of *publication* of protected information outside the statute's reach because no specific recipient is proven simply misunderstands the textual scheme that Congress has forged. The action alleged here, placing the information on the windshield of the vehicle in plain view on a public way, is certainly sufficient to come within the activity regulated by the statute regardless of whether another person viewed the information or whether law enforcement intended it to be viewed only by Mr. Senne himself. The real effect of the placement of the ticket was to make available Mr. Senne's motor vehicle record to any passer-by. This sort of publication is certainly forbidden by the statute.

The Village also makes a final, related argument that, in order to form the basis for liability, any disclosure must have been made knowingly. *See* 18 U.S.C. § 2724(a) ("A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains[] . . . ."). According to the Village, because the officer who placed the ticket on the windshield did not know that anyone other than Mr. Senne would view it, there can be no liability. This argument does not persuade us for two reasons. First, it rests on the Village's erroneous notion that, in order for a disclosure to occur, there must be an identified recipient. Second, it fundamentally misunder-

stands the term "knowingly." Voluntary action, not knowledge of illegality or potential consequences, is sufficient to satisfy the mens rea element of the DPPA. *See Pichler v. UNITE*, 542 F.3d 380, 396-97 (3d Cir. 2008) (discussing the term "knowingly" as it is used in the civil liability provisions of the DPPA and finding that knowledge of illegality is not an element).

### B. Whether the Statute Authorized the Disclosure

#### 1.

Having determined that there was a disclosure, we now turn to whether the police department's disclosure of Mr. Senne's motor vehicle record violated the statute. This task also is basically one of statutory construction.

We focus on the language of the statute, turning to § 2721(b), which contains the universe of required and permissible disclosures:

> **(b) Permissible uses**.--Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.),

and chapters 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2), may be disclosed as follows:

**(1)** For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

**(2)** For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers.

**(3)** For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only--

**(A)** to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

**(B)** if such information as so submitted is not correct or is no longer correct, to obtain the correct infor-

mation, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

**(4)** For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

**(5)** For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

**(6)** For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

**(7)** For use in providing notice to the owners of towed or impounded vehicles.

**(8)** For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

**(9)** For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

**(10)** For use in connection with the operation of private toll transportation facilities.

**(11)** For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

**(12)** For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

**(13)** For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

**(14)** For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

18 U.S.C. § 2721(b).

Against the backdrop of the general rule prohibiting disclosures in subsection (a), subsection (b) provides

both a category of mandatory disclosures and several categories of permissive disclosures. *See Graczyk v. West Publ'g Co.*, 660 F.3d 275, 280 (7th Cir. 2011) (identifying the statute's "countervailing purpose" as "allow[ing] legitimate users to access the records"). The permissive disclosures number fourteen in total and cover a range of purposes and recipients including public entities, insurers, licensed private investigators and certain commercial users such as bulk marketers.

On appeal, the Village contends that the placement of the citation on Mr. Senne's windshield was permitted under the statute either because the disclosure was "[f]or use by a[] . . . law enforcement agency[] in carrying out its functions," *id.* § 2721(b)(1), or "[f]or use in connection with any civil[] . . . [or] administrative[] . . . proceeding . . ., including the service of process," *id.* § 2721(b)(4).[11] The Village does not describe in any length how all the information printed on the ticket served either purpose; instead, it maintains, in effect, that the statute does not require that analysis. In the Village's view, as long as it can identify a subsection of the law under which *some* disclosure is permitted, *any* disclosure of information otherwise protected by the statute is exempt, whether it serves an identified purpose or not.

We cannot accept the Village's position. As we already have explained, it is necessary to view each provision in context, with an eye toward its contribution to the

---

[11] On appeal, the Village no longer asserts that any disclosure was permitted under 18 U.S.C. § 2721(b)(2).

"overall statutory scheme." *See Smith*, 255 F.3d at 448 (internal quotation marks omitted). Here, the statute's purpose, clear from its language alone, is to prevent all but a limited range of authorized disclosures of information contained in individual motor vehicle records. It is necessary that we respect this textually explicit purpose as we evaluate the coverage of the exceptions within the statute's broad mandate.

Both of the exceptions that the Village identifies, along with most of the other exceptions in the statute, begin with the phrase "[f]or use." In the Village's view, these words supply no meaning to the statutory text other than to link grammatically the "may be disclosed" language in the introductory paragraph of § 2721(b) to the specific purposes and recipients identified in its subsections. We believe that this explanation is unsatisfactory. A basic canon of construction requires us to give meaning to every word of a statute. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). Moreover, and especially in light of the particular statutory structure here that sets forth such a broad prohibition against disclosure, the exceptions should not be read to eviscerate the rule they modify. The words "[f]or use" perform a critical function in the statute and contain the necessary limiting principle that preserves the force of the general prohibition while permitting the disclosures compatible with that prohibition.

Specifically, when the statutory language says that a disclosure is authorized "[f]or *use* by a[] . . . law enforcement agency[] in carrying out its functions," 18 U.S.C. § 2721(b)(1) (emphasis added), that language means

that the actual information disclosed—i.e., the disclosure as it existed in fact—must be information that is *used* for the identified purpose. When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party. In short, an authorized recipient, faced with a general prohibition against further disclosure, can disclose the information only in a manner that does not *exceed the scope* of the authorized statutory exception. The disclosure actually made under the exception must be compatible with the purpose of the exception. Otherwise, the statute's purpose of safeguarding information for security and safety reasons, contained in the general prohibition against disclosure, is frustrated.

Another part of the statutory language supports our conclusion. As we have noted, the statute provides even greater protection to a special class of data referred to as "highly restricted personal information." 18 U.S.C. § 2721(a)(2). Such information includes an individual's social security number, photograph and medical or disability information. *Id.* § 2725(4). For this class of information, the statute allows for access under only four of the listed fourteen exceptions, including both the government function exception and the court process exception at issue in this case. *Id.* § 2721(a)(2) (listing as permissible uses those described in § 2721(b)(1) and (4)). Clearly, this section recognizes the government's legitimate need for broader access to personal information than the statute otherwise provides. Nevertheless, it does not provide unlimited authority for law enforcement to access or

disseminate the information. Instead, the statute merely allows that certain entities, including law enforcement, may both need and use more *kinds of* information than other authorized users, *within the limitations of the existing exceptions*.

The fact that the statute maintains for highly restricted personal information the existing exceptions for use and dissemination provides further support for the view that the exceptions must be read narrowly. If, instead, we were to read the exceptions as broadly as the Village asserts, the effect of the "highly restricted personal information" section would be that the officer could have printed Mr. Senne's photograph and social security number on the citation and left it open to public view. We decline to read this statute, with a chief aim of privacy protection, to allow such a dangerous result. *See City of Chicago v. United States Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms*, 423 F.3d 777, 781 (7th Cir. 2005) (noting that we will not read a statute to thwart Congress's manifest intent).

We conclude that the text of the statute limits the content of authorized disclosures of protected information in motor vehicle records through its requirement, clear on its face, that any such disclosure be made "[f]or use" in effecting a particular purpose exempted by the Act.[12]

---

[12] We pause to emphasize that we do not read "use" to mean "necessary use," nor do we require the Village to adopt some form of "best practices" not commanded by the statute.

**2.**

Although an analysis of the statutory text provides us with a clear answer to our inquiry, we note that the limited legislative history provides significant support for our conclusion. Specifically, it is clear that safety and security concerns associated with excessive disclosures of personal information held by the State in motor vehicle records were the primary issue to be remedied by the legislation. *See, e.g.*, 140 Cong. Rec. H2526 (daily ed. Apr. 20, 1994) (statement of Rep. Porter Goss) ("The intent of this legislation is simple--to protect the personal privacy and safety of all American licensed drivers."). In hearings held in the House Subcommittee on Civil and Constitutional Rights, numerous witnesses testified regarding the grave consequences of open access to government records of personal information. Not surprisingly, many witnesses mentioned the murder of an actress, Rebecca Schaeffer, by a stalker who had obtained her unlisted home address through the California DMV, a crime that was viewed as a catalyst for both state law privacy protections and the DPPA itself.[13] Other witnesses testified about the impact of the availability of DMV records on the safety of domestic

---

[13] *See, e.g.*, *The Driver's Privacy Protection Act of 1993: Hearing on H.R. 3365 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary* ("*Hearing on H.R. 3365*"), 103d Cong., 2d Sess., 1994 WL 212698 (Feb. 4, 1994) (statement of Rep. James P. Moran); *Hearing on H.R. 3365*, 1994 WL 212813 (Feb. 3, 1994) (statement of Janlori Goldman, Director, Privacy and Technology Project, American Civil Liberties Union).

violence victims[14] and law enforcement officers and their families[15] targeted for retribution. Also mentioned, however, were more random acts of violence, including a crime spree of home invasion robberies in Iowa that began when teenagers took down license numbers of expensive vehicles and then obtained the registered owners' home addresses from DMV records.[16] The bill, it seems, was viewed predominantly as a public safety measure.

Not surprisingly, the Act's expanded authority for law enforcement was an important part of the same narrative. Providing law enforcement with records as a tool in carrying out their mission was viewed as an appropriate piece of the crime-control strategy the bill

---

[14] *Hearing on H.R. 3365*, 1994 WL 212822 (Feb. 3, 1994) (statement of David Beatty, Director of Public Affairs, National Victim Center).

[15] *Hearing on H.R. 3365*, 1994 WL 212833 (Feb. 3, 1994) (statement of Donald L. Cahill, Legislative Chairman, Fraternal Order of Police).

[16] *Hearing on H.R. 3365*, 1994 WL 212698 (Feb. 4, 1994) (statement of Rep. James P. Moran); *see also, e.g.*, *Hearing on H.R. 3365*, 1994 WL 212701 (Feb. 4, 1994) (statement of David F. Snyder, Assistant General Counsel, American Insurance Association) ("We support this legislation because it may, at least to some extent, prevent violent crime."); 139 Cong. Rec. S15,762 (daily ed. Nov. 16, 1993) (statement of Sen. Barbara Boxer) (citing similar incidents).

would create.[17] Speaking on the Senate floor in support of the bill, Senator Harkin noted that the bill allowed not only access to information by law enforcement but, "[i]n appropriate circumstances," disclosure "to a citizen or group of citizens [that] will assist in carrying out the function of the agency," such as a neighborhood watch organization. 139 Cong. Rec. S15,962 (daily ed. Nov. 17, 1993) (statement of Sen. Harkin). However, he qualified that the exception for law enforcement use "is not a gaping loophole in this law." *Id.* The exception "provides law enforcement agencies with latitude in receiving and disseminating this personal information," when it is done *"for the purpose of deterring or preventing crime or other legitimate law enforcement functions." Id.* (emphasis added); *see also* 139 Cong. Rec. S15,764 (daily ed. Nov. 16, 1993) (statement of Sen. John Warner) ("There are specific exceptions of course for law enforcement individuals and other areas where proven experience shows that this information should flow. *But in*

---

[17] Looking at all of the available history, there is no question that the exception for law enforcement access to records was viewed as a critical element in the bill's attempt to "balance . . . the legitimate governmental and business needs for this information[] and the fundamental right of our people to privacy and safety." 139 Cong. Rec. S15,763 (daily ed. Nov. 16, 1993) (statement of Sen. Barbara Boxer). The existence of an exception related to law enforcement functions was mentioned by numerous supporters of the bill. *See, e.g.,* 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994) (statement of Rep. James Moran).

*those instances we have to presume it is somewhat protected*."
(emphasis added)).

The legislative history confirms what a careful and thorough reading of the statute already has revealed: Congress did not intend that the statutory exceptions be divorced, logically or practically, from the purpose of the statute. With respect to the law enforcement-related exceptions in particular, there is support in the legislative history for the view that the exceptions not only were compatible with the overall purpose, but indeed supported it. Consistent with the textual interpretation that we already have made, the legislative history reflects the view that law enforcement has a legitimate need for information contained in state records and the authority to use that information to effectuate the purposes identified in the Act without fear of liability.

## C. The Effect of the DPPA on the Village's Parking Citation

With this understanding of the statute firmly in mind, we turn to the particulars of this case in its current posture. Certainly, the complaint before us plausibly alleges that the information actually disclosed by the parking citation was not "[f]or use by a[] . . . law enforcement agency[] in carrying out its functions," or "[f]or use in connection with any civil[] . . . [or] administrative[] . . . proceeding . . ., including the service of process." 18 U.S.C. § 2721(b)(1), (4).

The citation provided to Mr. Senne did constitute service of process in the administrative proceeding regarding the parking violation.[18] Further, the issuance of a parking citation is part of the function of the Village's police department. However, the complaint does put in issue whether all of the disclosed information actually *was used* in effectuating either of these purposes. The otherwise protected information actually disclosed here included Mr. Senne's full name, address, driver's license number, date of birth, sex, height and weight. It is not at all clear that either of the statutory exceptions at issue implicated the release of all of this information. With respect to some of that information, it is difficult to conceive, even on a theoretical level, how such information could play a role in the excepted law enforcement purposes. That issue cannot be resolved on review of the entry of judgment on a motion to dismiss by the Village.

Further proceedings will permit the parties to explore this question. There are very real safety and security concerns at stake here. For example, an individual seeking to stalk or rape can go down a street where overnight parking is banned and collect the home address and personal information of women whose vehicles have been tagged. He can ascertain the name,

---

[18] *See* 625 ILCS 5/11-208.3(b)(3) (authorizing municipalities to effect service for parking violations by placing notice on the vehicle); Palatine, Illinois, Code of Ordinances § 2-707(b)(3) (allowing complaints to be affixed to "the property where the violation is found").

exact address including the apartment number and even other information such as sex, age, height and weight pertinent to his nefarious intent. Similarly, a public official, having gone to great lengths to protect himself and his family from the threat of violence that unfortunately every public official faces, bears the risk that an expired parking meter violation might provide an opportunity for an individual intent on causing the official or his family bodily harm or death. Indeed, in the original hearing on the DPPA, law enforcement agents themselves expressed concerns about their personal safety and the safety of their families because of information that otherwise could be obtained from the records associated with their personal vehicles.[19] The possibilities for identity theft are obvious. Given the concern of Congress for these safety and security issues, the disclosed information actually must be used for the purpose stated in the exception.[20]

---

[19] *See Hearing on H.R. 3365*, 1994 WL 212833 (Feb. 3, 1994) (statement of Donald L. Cahill, Legislative Chairman, Fraternal Order of Police).

[20] The issue of the allocation of the burden of proof with respect to the exceptions, *see Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F.3d 1107, 1110-14 (11th Cir. 2008), is premature at this stage of the proceeding. We express no opinion on the matter. We also note that our holding today makes any discussion of the appropriate measure of damages under the statute premature. We therefore pretermit any discussion of the matter.

**Conclusion**

We hold that the DPPA's general rule of non-disclosure of personal information held in motor vehicle records and its overarching purpose of privacy protection must inform a proper understanding of the other provisions of the statute. Accordingly, we hold that any disclosure must comply with those legitimate uses of information identified in the statutory exceptions. With these principles in mind, we hold that the Village's placement of protected personal information in view of the public constituted a disclosure regulated by the statute, regardless of whether Mr. Senne can establish that anyone actually viewed it. Furthermore, because Mr. Senne has articulated a plausible claim that the Village's actions failed to fulfill its statutory duties, the case should not have been dismissed.

REVERSED and REMANDED

POSNER, *Circuit Judge*, dissenting. If federal courts followed the well-known precept of medical ethics *primum non nocere* (first, do no harm), the Village of Palatine, the defendant in this suit under the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq.*, would

win; and likewise if the Act were interpreted literally. I am not a fan of literal interpretation. But it is the proper default rule when it has reasonable consequences and there is no indication that the legislature stumbled in trying to translate legislative purpose into words. The majority's free interpretation of the Act is not needed to avoid absurd results or achieve the legislature's purpose; it is unlikely to do any good; it is bound to do harm.

By incorporation of the definition of "personal information" found in 18 U.S.C. § 2725(3)—"information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information"—the Driver's Privacy Protection Act forbids "a State department of motor vehicles, and any officer, employee, or contractor thereof . . . [to] knowingly disclose or otherwise make available to any person or entity . . . personal information . . . about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b)." § 2721(a)(1). The Illinois Department of Motor Vehicles, and its employees and contractors, are not defendants in this suit, but "an authorized recipient of personal information" from the department is—the municipal police department that ticketed the plaintiff; and it "may resell or redisclose personal information only for a use permitted under subsection (b)." § 2721(c).

So one goes to subsection (b) and finds in (b)(4) that "disclosure" of personal information is permitted "for use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court." A proceeding for the imposition of a parking fine is an administrative proceeding, and personal information on the parking ticket placed on the windshield of the alleged violator's vehicle is "for use in connection with" an "administrative . . . proceeding" in a "local court," and specifically the "service of process" phase of the proceeding. The ticket is process; placing it on the windshield is the conventional method of serving process for parking violations; and so a literal interpretation is that the police can place personal information on the ticket.

There is no indication that without being able to express its intention in words Congress intended to forbid police to place personal information on a parking ticket. The Act does not limit disclosure that falls within one of its exceptions to what is "reasonable" or "necessary," or authorize judges to impose such a requirement. The concern that gave rise to the statute was with stalkers who went to motor vehicle bureaus to obtain the home addresses of their intended victims, more than 30 states having made such information available to members of the public for a small fee as a means

of enhancing state revenues. A television actress was murdered in 1989 by a stalker whose private investigator had lawfully obtained her unlisted address from the California Department of Motor Vehicles. That unfortunate incident was a catalyst of the Driver's Privacy Protection Act. *Taylor v. Acxiom Corp.*, 612 F.3d 325, 336 and n. 9 (5th Cir. 2010); *Pichler v. UNITE*, 542 F.3d 380, 400 (3d Cir. 2008) (dissenting opinion).

Palatine's printing of drivers' names and addresses on parking tickets that are then placed on violators' windshields does not encourage or facilitate stalking. Only with difficulty can one imagine a stalker who, noticing a woman he'd like to stalk get into her car and drive off, follows her and when she parks lurks behind her car in the hope that it will be ticketed and that if that happens he'll be able without being observed to peek at the ticket and discover the owner's name and address. Has this ever happened? The plaintiff's lawyer admitted at oral argument never having heard of such a thing. A far more plausible strategy for a stalker who had come across his intended victim's vehicle would be to follow her home, without having to rely on her parking illegally and the police coming along and writing a ticket rich in personal information.

Why bend the statute to solve a nonexistent problem? Stalkers are not the only invaders of privacy, but who are the non-stalkers who peek at tickets on windshields and write down the information they find there? Are there any such? Is it wise to dislocate a statute in order to solve a problem that so far as any-

one knows or can guess has never arisen and will never arise?

The majority opinion regards the placing of the name and address of the owner of the ticketed vehicle on the parking ticket as a gratuitous act that, harmless or not, serves no law enforcement purpose and therefore can't be for a permitted use. Many, perhaps most, police don't have time to place personal information on a parking ticket, because they would have to look up the information in the database of the motor vehicle bureau and write it on the ticket. Yet placing the information on the ticket serves a modest error-correction function, which presumably is why some police departments do place such information on parking tickets. Suppose the name or address of the vehicle's owner is listed incorrectly in the motor vehicle bureau's database, or the police copy the wrong name or address in writing the ticket. Or suppose the name and address are correct but the date of birth, the weight, or the height listed on the ticket is not that of the named person, thus indicating that there has been a mistake. The discovery of an error in the ticket may impel the owner to respond to the summons by informing the court that he is not the person named in it or that his true address and other personal information are different from what is written on the ticket; for he will worry that unless the mistakes are corrected he won't receive any future communications from the motor vehicle bureau and other state and local agencies that rely on it for personal information.

This perhaps is small beer but on the other side is a nonexistent risk, whether of stalking or of some other harmful breach of privacy. And even if listing height and weight on a ticket is gratuitous, the majority's decision is apt to entangle the courts in closer questions of the legitimacy of including particular personal information on a parking ticket, questions that will generate costly and time-consuming litigation and pointless wealth transfers from taxpayers to violators of the parking laws. The majority opinion does reserve the possibility that it might be permissible to write the owner's name on the ticket. But it is a faint possibility, since the recipient will know who the owner is—himself, or a family member, or whomever he borrowed the car from—and so the inclusion of his name won't be strictly necessary.

Because the statute does not place Palatine or any other community on notice that including personal information on a parking ticket is prohibited, every police department in the Seventh Circuit that has done such a thing within the four-year statute of limitation for private suits (see 28 U.S.C. § 1658(a); *Hurst v. State Farm Mutual Auto Ins. Co.*, Civ. Action No. 10-1001-GMS, 2012 WL 426018, at *9 (D. Del. Feb. 9, 2012)) faces, as a result of today's decision, liability for "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). So little Palatine (its population roughly one-fortieth that of Chicago) faces, in this class action suit filed on behalf of everyone who has received a parking ticket in the Village within the period of the statute of limitations, a potential liability of some $80

million in liquidated damages—more than $1,000 per resident.

The Village can obtain no succor from our decision in *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 538 (7th Cir. 2012), which held that a claim for liquidated damages based on identical language in the Video Privacy Protection Act, 18 U.S.C. § 2710, required proof of injury in the form of an actual invasion of privacy. The defendant in *Sterk* had failed in its statutory duty to destroy lawfully obtained documents containing personal information, but there was no indication that any of the documents had been disclosed to anyone before they were destroyed. In contrast, personal information is "disclosed" in a letter even if, because the letter was destroyed en route to the addressee, no invasion of privacy results. Similarly, if a city posted parking violators' names and addresses on a publicly accessible website, the act of posting would be disclosure even if no one visited the website. So I don't quarrel with the statement in the majority opinion that publicly posting information is "disclosure" whether or not anyone ever reads it or is likely to do so. But this just underscores the magnitude of the liability that the opinion fixes on Palatine.

The opinion states that it is "premature" to think about damages at this point. That is short sighted. Before creating a new cause of action, a court should consider the consequences.

And who will benefit most from the class actions that the majority opinion endorses and invites? Why, scofflaws,

of course, because they have the most tickets, each now worth $2,500. From now until the statute is amended (unless today's decision is reversed by the Supreme Court first), only a sucker would park legally in the Village of Palatine.

FLAUM, *Circuit Judge*, with whom EASTERBROOK, *Chief Judge*, and POSNER and SYKES, *Circuit Judges*, join, dissenting. Although I agree with the majority's conclusion that the posting of personal information on a parking citation constitutes a disclosure within the meaning of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*, I am unable to agree with the majority's conclusion that permissible disclosures are limited to such information as is necessary to effectuate the purposes of the statutory exceptions. Neither the text nor the legislative history conveys Congress's intent to limit the information that may be disclosed in connection with a particular exception.

The present dispute turns on the meaning of the DPPA, or, more specifically, on the meaning of the exceptions that permit the disclosure of personal information. Our goal is to ascertain Congress's purpose in enacting the legislation. *See, e.g., Milner v. Dep't of Navy*, ___ U.S. ___,

131 S. Ct. 1259, 1264 (2011) (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)); *United States v. N.E. Rosenblum Truck Lines, Inc.*, 315 U.S. 50, 53 (1942). Generally, the plain language of a statute is the best evidence of legislative intent. *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 11 (2008) ("The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances." (quotation marks and alterations omitted)); *United States v. Ye*, 588 F.3d 411, 414-15 (7th Cir. 2009). In looking to the language of the DPPA, we are mindful that statutory interpretation is a "holistic endeavor," which requires courts to look at words and their meaning not in isolation but in the context of the statutory scheme in which they appear. *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988)).

Title 18, Section 2721(b), of the United States Code, lists fourteen "permissible uses" of personal information that do not violate the DPPA. Relevant to the practice challenged in this case, Section 2721(b) provides: "Personal information referred to in subsection (a) . . . may be disclosed . . . (4) [f]or use in connection with any civil, criminal, administrative, or arbitral proceeding in any . . . court or agency or before any self-regulatory body, including the service of process . . . ." Under Illinois law and by municipal ordinance, the parking citation that Senne received constitutes service of legal process. *See* 625 ILCS 5/11-208.3(b)(3) (authorizing municipalities to

serve process for parking violations by means of affixing the notice to the vehicle); Village of Palatine Ordinance 2-707(b)(3) (service of complaint in administrative proceedings may be effected by affixing complaint to the property where the violation is found). Indeed, the majority recognizes that the parking citation constitutes service of process. *See* Op. at 24 & n.18.[1] In my view, because a municipality falls outside the DPPA's proscriptions when it discloses personal information as part of serving legal process, the Village's disclosure of information in the parking citation does not violate the DPPA. The DPPA does not ask whether the service of process reveals no more information than necessary to effect service, and so neither should we.

In determining that subsection 2721(b)(4) permits the disclosure of all personal information, not just that which is reasonably necessary, I adhere to the basic canon of statutory interpretation of giving meaning to every word. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). The

---

[1] The en banc majority also determines that the exception found in subsection 2721(b)(1) applies because the issuance of the citation is one of the functions of the Village's police department. *See* Op. at 24. The initial panel majority found it unnecessary to reach this issue after concluding that the personal information was properly disclosed under the (b)(4) exception. *See Senne v. Village of Palatine, Ill.*, 645 F.3d 919, 923-24 (7th Cir. 2011) (majority opinion). There is similarly no need to address the (b)(1) exception here since the disputed phrase "for use" applies in the same way to both exceptions.

words "for use," which introduce each subsection of Section 2721(b)'s list of exceptions, indicate that personal information can be disclosed when it is used for one of the enumerated purposes. This interpretation does not read "for use" out of the DPPA, nor does it limit the phrase's function to linking grammatically the "may be disclosed" language in the introductory paragraph of Section 2721(b) to the purposes and recipients listed in the subsections. The express terms of the statute permit the disclosure of information when one of Section 2721(b)'s exceptions applies. All of the information to which Senne objects was used in the parking citation, and its disclosure was therefore proper under subsection 2721(b)(4).

The majority interprets "for use" as expressing a limiting principle for what information may be disclosed under a particular exception. By restricting the scope of the exceptions, the majority essentially inserts a qualifier, such as "appropriate" or "reasonable" or "necessary," into the phrase "for use." Subsection 2721(a)(1) of the DPPA prohibits states from disclosing personal information "except as provided in subsection (b) of this section," but the DPPA does not contain any language that limits disclosure to information that complies with the purposes of Section 2721(b) or that is actually used to carry out an enumerated purpose. Some of the exceptions listed in Section 2721(b) limit how the information can be used, but subsection 2721(b)(4)'s exception for service of process does not contain any words of

limitation.[2] Thus, the DPPA's text makes clear that Congress intended to leave states with considerable leeway. Congress could have included a qualifier for disclosures, but it did not do so. Congress of course remains at liberty to amend the statute, and, for the policy reasons advanced by the majority, it may well see the need to do so. However, the current text does not support the majority's view.

The majority's interpretation of "for use" is informed by its understanding of Congress's intent in enacting the DPPA. The majority asserts that "the statute's purpose of safeguarding information for security and safety reasons, contained in the general prohibition against disclosure" would be "frustrated" if "for use" were construed to allow any information to be disclosed as part of an exception. Op. at 18. But the legislative history does not convey an intent to eliminate any and all dangers that can be traced back to the disclosure of information from motor vehicle records.

The legislative history reveals that Congress enacted the DPPA as a crime-fighting measure in response to specific concerns. The murder of actress Rebecca Schaeffer by a stalker who acquired her address from a

---

[2] Similarly, Congress limited permissible disclosures by requiring express consent for the disclosure of "highly restricted personal information." *See* 18 U.S.C. § 2721(a)(2). Notably, although Congress applied this restriction to ten of Section 2721(b)'s exceptions, Congress did not apply this heightened restriction to subsection 2721(b)(4).

motor vehicle department is widely recognized as the catalyst for the DPPA. *See Taylor v. Acxiom Corp.*, 612 F.3d 325, 336 (5th Cir. 2010). Similarly, Senator Barbara Boxer, one of the DPPA's sponsors, emphasized that "[i]n 34 States, someone can walk into a State Motor Vehicle Department with your license plate number and a few dollars and walk out with your name and home address." 139 Cong. Rec. S15,762 (daily ed. Nov. 16, 1993); *see also* 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994) (statement of Rep. Moran, a sponsor of the DPPA) ("A total stranger can obtain personal information about you without knowing anything more about you than your license plate number and you are helpless to stop it."). The legislative history also contains statements about the need to protect domestic violence victims and law enforcement officers from retaliatory attacks. *See* Op. at 20-21 & nn. 14-15. Rather than evincing the intent to guard against all imaginable dangers, the legislative history emphasizes Congress's intent to prevent the specific danger that arises when individuals are able to obtain personal information *upon request* from state motor vehicle records. *See, e.g.*, 139 Cong. Rec. S15,765 (daily ed. Nov. 16, 1993) (statement of Sen. Biden) ("This amendment closes a loophole in the law that permits stalkers to obtain—on demand—private, personal information about their potential victims. . . . Thus, potential criminals are able to obtain private, personal information about their victims simply by making a request.").

The majority is concerned that interpreting "for use" to allow the disclosure of information that is not strictly

necessary for the exception creates safety risks, such as a stalker stumbling upon a parking citation containing information about his or her target, or a miscreant selecting a target based on the information provided in a citation. While recognizing the possibility of such chance crimes, I conclude that these crimes were not the types of crimes that motivated Congress to enact the DPPA. Though individual legislators might well favor placing greater restrictions on what state motor vehicle departments can disclose, it is not evident that Congress as a whole would wish to do so. It is not uncommon for Congress, out of respect for our federal system, to limit its response to legitimate policy challenges—even those with apparent (and perhaps appealing) solutions.

Congress may have decided not to qualify "for use" so as to limit the exercise of judicial discretion. Under my interpretation of "for use," the role of the judiciary is confined to determining how the public agency was using the information. If the agency was using the information in connection with one of Section 2721(b)'s permissible uses, then the agency's disclosure of information is valid; otherwise, the agency's disclosure violates the DPPA. This categorical approach may end up over- or under-inclusive at times, but it has the virtue of being straightforward, predictable, and less costly to administer. By contrast, under the majority's interpretation of "for use," the judiciary is tasked with determining what pieces of information are needed in order to carry out the purpose of the applicable exception. The statute offers no guidance to the judges, lawyers, and

public actors who will inevitably struggle to distinguish between necessary and extraneous information. By calling on judges to ban seemingly unnecessary disclosures, the majority makes the statute less straightforward, less predictable, and more costly to administer (due to the litigation expenses associated with determining the propriety or necessity of each disclosure). The majority's interpretation of "for use" thereby exposes municipalities to substantial penalties (possibly $80 million for Palatine) for failing to predict what disclosures a judge will find to be appropriate. It is not our responsibility to evaluate the two approaches and determine which constitutes better policy; rather, our responsibility is to determine which approach Congress incorporated into the DPPA. *See Pac. Operators Offshore, LLP v. Valladolid*, ___ U.S. ___, 132 S. Ct. 680, 690 (2012) ("[I]f Congress' coverage decisions are mistaken as a matter of policy, it is for Congress to change them. We should not legislate for them." (quoting *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 427 (1985))). Far from frustrating Congress's intent, my interpretation defers to the intent expressed by Congress when it included the phrase "for use" without any qualifier or any limiting guidelines.

Because the text contains no qualifier, the majority struggles to articulate the substance of the qualifier that it reads into the phrase "for use." In certain parts of its opinion, the majority describes the standard for evaluating disclosures in broad, conclusory terms that express policy objectives but shed little light on how

to distinguish proper from improper disclosures. *See, e.g.*, Op. at 17 ("The words '[f]or use' . . . contain the necessary limiting principle that preserves the force of the general prohibition while permitting the disclosures compatible with that prohibition."); Op. at 23 ("Congress did not intend that the statutory exceptions be divorced, logically or practically, from the purpose of the statute."). In other parts of its opinion, the majority states that any disclosure "must be compatible with the purpose of the exception," Op. at 18, must "effect[] a particular purpose exempted by the Act," Op. at 19, and "must comply with those legitimate uses of information identified in the statutory exceptions," Op. at 26. This language appears slightly more concrete, but it still falls short of providing actual guidance. Reasonable minds will disagree as to what disclosures are compatible with the purpose of the exception, while arguably extraneous disclosures might still be viewed as compatible. The majority defines "for use" as permitting "an authorized recipient" to "disclose the information only in a manner that does not *exceed the scope* of the authorized statutory exception," Op. at 18 (emphasis in original), but the majority does not provide any definitions, tests, or tools for determining the scope.

By construing "for use" to contain a limiting principle without articulating its substance, the majority effectively calls on judges to determine whether a particular disclosure is "appropriate" or "reasonable" or "necessary" for carrying out the exception. The majority states that it does not read "use" as signifying "necessary use," *see*

Op. at 19 n.12, but it provides no alternative definition. The majority also asserts that it does not read a "best practices" requirement into the statute, *see id.*, but it does not explain what distinguishes "legitimate" or "compatible" uses, which are apparently mandated by the statute, from best practices, which are not. The dissent to the initial panel opinion had interpreted the DPPA as limiting disclosures to "the personal information reasonably necessary to effectuate the governmental purpose set forth in the exception." *Senne v. Village of Palatine, Ill.*, 645 F.3d 919, 926 (7th Cir. 2011) (Ripple, J., dissenting); *see also id*. ("[T]he information disclosed under an exception must have a reasonable relationship to the purpose of the exception."). Though the en banc opinion does not adopt the "reasonably necessary" standard, it supplies no clear standard in its place.

Finally, certain parts of the majority's opinion define "for use" as requiring that "the disclosed information *actually must be used* for the purpose stated in the exception." Op. at 25 (emphasis added); *see also* Op. at 17-18 ("[T]hat language means that the actual information disclosed—i.e., the disclosure as it existed in fact—must be information that is *used* for the identified purpose." (emphasis in original)); Op. at 24 ("[T]he complaint does put in issue whether all of the disclosed information actually *was used* in effectuating either of these purposes." (emphasis in original)). This approach does help judges by allowing them to evaluate *ex post* whether the information was actually used to carry out the purpose of the exception. This approach does not, however, help

municipalities to determine *ex ante* whether a particular disclosure violates the DPPA. The determination of what information will actually be used to carry out an exception cannot always be made in advance.[3] Further, as Judge Posner discusses, there are hypothetical uses for all of the information disclosed by Palatine. Municipalities might seek to disclose more information than strictly necessary to account for the risk that the core information is erroneous or outdated.

The text of the DPPA simply does not contain the "actual use" limitation that the majority reads into it. *Cf. Howard v. Criminal Info. Servs.*, 654 F.3d 887, 892 (9th Cir. 2011) ("There is . . . no problem with Defendants obtaining the personal information for potential future use, even if they may never use it. The DPPA does not contain a temporal requirement for when the information obtained must be used for the permitted purpose. Nor is there a requirement that once the information is obtained for a permitted purpose that it actually be used at all. The DPPA only requires that Defendants obtained the information for a permitted purpose."). In conflict with Congress's intent to preserve the ability of law enforcement and municipalities to carry out their functions, the majority's interpretation opens municipali-

---

[3] Although the majority insists that permissible disclosures are not limited to those that are "necessary" to effectuate the exception, *see* Op. at 19 n.12, a "necessary" standard may be the only way to determine in advance what information will ultimately be used.

ties up to substantial liability for incorrectly predicting exactly what information will be used in the course of carrying out an exception.

Contrary to the view of my colleagues in the majority, I do not construe Section 2721(b) as permitting only the disclosure of information that is necessary to carry out the purpose of an exception. Congress has the authority to amend the DPPA to restrict disclosures to those that are "for a necessary use" or "for an appropriate use," but the existing text and legislative history do not evince Congress's intent to do so. Therefore, while I concur with the majority's conclusion that the Village's action constitutes a disclosure, I respectfully dissent from its conclusion that the disclosure violates the DPPA. In my judgment, because Senne's information was used in the parking citation and the citation constitutes service of process, the Village's disclosure does not violate the DPPA.